**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**FEB 2 2005**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

GEORGE SHEPARD,

Defendant-Appellant.

No. 03-3293

---

**Appeal from the United States District Court**
**for the District of Kansas**
**(D.C. No. 01-CR-10116-01-JTM)**

---

Submitted on the briefs:

Eric F. Melgren, United States Attorney, and Brent I. Anderson, Assistant United States, Wichita, Kansas, for Plaintiff-Appellee.

Larry Dean Kissee, Ash Flat, Arkansas, and Jeremy B. Lowrey, Sheridan, Arkansas, for Defendant-Appellant.

---

Before **EBEL, McWILLIAMS,** and **HENRY**, Circuit Judges.[*]

---

**HENRY**, Circuit Judge.

---

[*]After examining the briefs and appellate record, this panel has determined unanimously to decide this case on the briefs without oral argument. *See* Fed. R. App. P. 34(f); 10th Cir. R. 34.1(G). The case is therefore ordered submitted without oral argument.

In July 2002, a jury found George Shepard guilty of twenty-four counts of money laundering, in violation of 18 U.S.C. § 1956(a)(1)(B)(i); one count of conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h); one count of transportation of stolen property, in violation of 18 U.S.C. § 2314; and one count of wire fraud, in violation of 18 U.S.C. § 1343. On appeal, Mr. Shepard argues that the evidence is insufficient to support his convictions. We exercise jurisdiction under 28 U.S.C. § 1291 and affirm Mr. Shepard's convictions on all counts.

## I. BACKGROUND

George Shepard was the chief welding inspector on a natural gas pipeline project between Mobile Oil Corporation and KN Energy near Liberal, Kansas. KN Energy, now doing business as Kinder Morgan, agreed in 1997 to install compressor stations for the project's pipelines. It retained Cisneros Welding and Construction ("CWC") as a contractor for the actual construction. Mr. Shepard oversaw the work performed by CWC to ensure the project's compliance with KN Energy's specifications. He reviewed and mailed daily time sheets for CWC workers to KN Energy's home office for payment. Mr. Shepard was paid salary and per diem by an engineering sub-contractor that invoiced KN Energy. His son, Kim Shepard ("Kim"), was another inspector on the project.

KN Energy's policies prohibited Mr. Shepard or Kim from renting their own welding equipment to CWC or KN Energy for use at the Liberal site. Around January 1998, Mr. Shepard asked a new CWC truck driver, Danny Blood, if Mr. Shepard could put a welding rig in Mr. Blood's name and collect rental checks. Mr. Blood agreed, cashed the first two checks for welding rig rentals, and forwarded the rental money to Mr. Shepard and Kim. Mr. Blood is not a welder and never worked on a welding rig. He remained on the payroll for rig rentals after cashing the initial checks, but payments no longer came to him. All but three rig rental checks made payable to Mr. Blood were deposited into bank accounts of Mr. Shepard or Kim. Rec. vol. III, doc. 111, at 555.

In addition, Mr. Shepard instructed Mr. Blood to haul KN Energy equipment from the Liberal site to Thayer, Missouri. There, Mr. Shepard and Kim owned Country Club Kennels and other property. Mr. Blood hauled a tractor, bobcat, brush hog, and backhoe from Liberal to Thayer. From January through April 1998, another CWC driver, Louis Loya, hauled four or five truck loads of equipment from Liberal to Thayer. This equipment included steel pipe, a small crane, a backhoe, prefabricated frames, and various tools.

Also in 1998, Mr. Shepard placed Jeremy Thomas Wooldridge on the CWC payroll as a welder. Mr. Wooldridge worked for the Shepards in Thayer, Missouri, but he never worked on the Liberal project. Mr. Shepard and Kim

-3-

deposited Mr. Wooldridge's welder checks into their bank accounts. Rec. vol. III, doc. 111, at 549-50. In addition, Mr. Shepard placed a fictitious employee named "Eloy Moreno" on the CWC payroll and collected payroll checks issued to "Mr. Moreno." Mr. Shepard also created a fictitious rental company, "Moreno Rentals," to generate CWC rental checks. Mr. Shepard and Kim collected the "Moreno Rental" checks and deposited them in the bank accounts of Mr. Shepard, Kim, and Country Club Kennels. *Id.* at 703.

The Liberal site's project manager became aware of possible problems and notified KN Energy in May or early June 1998. A KN Energy audit discovered that (1) people on the payroll were not actually working; (2) welding equipment that the welder did not own was being charged to the project; (3) materials that did not relate to the project, such as dog feeders and dog food, were being purchased; and (4) some of Mr. Shepard's storage trailers and welding rigs were being used on the project. Rec. vol. I, doc. 109, at 44. KN Energy terminated Mr. Shepard's employment in early June 1998. That same month, KN Energy recovered on Mr. Shepard's Missouri property fifty-five company items with an estimated value of $88,854.

The government charged Mr. Shepard and Kim in a superceding indictment with twenty-nine counts of money laundering, one count of conspiracy to commit money laundering, one count of transportation of stolen goods, and one count of

wire fraud. Prior to trial, the district court granted defendants' motions for severance. At the conclusion of the government's evidence at Mr. Shepard's trial, he moved for a judgment of acquittal on all counts. The district court dismissed five counts of money laundering because those checks "were deposited directly into Kim Shepard or George Shepard's accounts" and did not satisfy the necessary concealment element for a money laundering conviction. Rec. vol. III, doc. 111, at 764. The jury found Mr. Shepard guilty of twenty-four counts of money laundering, one count of conspiracy to commit money laundering, one count of transportation of stolen goods, and one count of wire fraud. A separate jury later found Kim guilty of eighteen counts of money laundering, one count of conspiracy to commit money laundering, and one count of wire fraud.

After the jury conviction, Mr. Shepard filed a motion for a judgment of acquittal. The district court denied the motion, sentenced Mr. Shepard to thirty-three months' imprisonment, followed by three years of supervised release, and ordered him to pay $106,328.71 in restitution.

## II. DISCUSSION

On appeal, Mr. Shepard contends that the government did not present sufficient evidence as to any of the offenses on which he was convicted. On this question, we review the record de novo. *United States v. Delgado-Uribe*, 363

F.3d 1077, 1081 (10th Cir. 2004). "We must determine whether viewing the evidence in the light most favorable to the Government, any rational trier of fact could have found Mr. Shepard guilty of the crime beyond a reasonable doubt." *Id.* (internal quotation marks omitted). This court does not weigh conflicting evidence nor consider the credibility of witnesses. *United States v. McKissick*, 204 F.3d 1282, 1289-90 (10th Cir. 2000). We only determine "whether [the] evidence, if believed, would establish each element of the crime." *United States v. Vallo*, 238 F.3d 1242, 1247 (10th Cir. 2001) (internal quotation marks omitted). "We will only overturn a jury verdict if no reasonable juror could have reached the disputed verdict." *United States v. Magleby*, 241 F.3d 1306, 1312 (10th Cir. 2001) (internal quotation marks omitted).

## A.    Money laundering

The jury found Mr. Shepard guilty of twenty-four counts of money laundering, in violation of 18 U.S.C. § 1956(a)(1)(B)(i). That section provides, in part:

> Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of a specified unlawful activity–knowing that the transaction is designed in whole or in part–to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity . . . shall be sentenced to a fine of not more than $500,000 or twice the value of the property involved in the transaction, whichever is greater, or imprisonment for not more than twenty years, or both.

Congress enacted this language in the Money Laundering Control Act of 1986 to target, as the term "laundering" connotes, the transformation of "dirty" funds from illegal activities into a "clean" and usable form. The statutory language, however, has needed some practical clarification. Thus, courts have sometimes referenced an earlier Executive Branch report to define money laundering's manner and objectives.

Money laundering is "the process by which one conceals the existence, illegal source, or illegal application of income, and disguises that income to make it appear legitimate." President's Commission on Organized Crime, *The Cash Connection: Organized Crime, Financial Institutions, and Money Laundering*, at 7 (Interim Report, Oct. 1984) [hereinafter *The Cash Connection*]; *see also United States v. Cuevas*, 847 F.2d 1417, 1419 n.2 (9th Cir. 1988) (adopting *The Cash Connection's* definition of money laundering); *United States v. Heyman*, 794 F.2d 788, 789 n.1 (2d Cir. 1986) (same). Money laundering schemes assist criminals who "seek to change large amounts of cash . . . into an ostensibly legitimate form, such as business profits or loans, before using those funds for personal benefit." *The Cash Connection* at 7; *see also United States v. Estermann*, 324 F.3d 565, 570 (7th Cir. 2003) ("In its classic form, the money launderer folds ill-gotten funds into the receipts of a legitimate business . . . ."). This circuit has noted its agreement "with the Executive Branch statements [in *The Cash Connection*] . . .

as to the purposes of the money laundering statute." *United States v. Garcia-Emanuel*, 14 F.3d 1469, 1474 (10th Cir. 1994).

On appeal, Mr. Shepard only challenges the sufficiency of the evidence in support of the "design" requirement of the money laundering statute. Aplt's Br. at 30-34. He asserts that the government did not prove that he knew his transactions were "designed in whole or in part [] to conceal or disguise" illegal proceeds. 18 U.S.C. § 1956(a)(1)(B)(i). He argues that transaction proceeds were "easily traceable" through the Shepards' deposits, and that their second-endorsement of several checks in question indicates a lack of design to conceal. Aplt's Br. at 32. Furthermore, Mr. Shepard maintains, documentary evidence from banks handling the financial transactions at issue created a "clear paper record" about the funds' source. *Id.* at 32-33.

This court has discussed several types of evidence that may demonstrate an intent to disguise or conceal illegal proceeds:

> They include, among others, statements by a defendant probative of intent to conceal; unusual secrecy surrounding the transaction; structuring the transaction in a way to avoid attention; depositing illegal profits in the bank account of a legitimate business; highly irregular features of the transaction; using third parties to conceal the real owner; a series of unusual financial moves cumulating in the transaction; or expert testimony on practices of criminals.

*Garcia-Emanuel*, 14 F.3d at 1475-76.

We have also described two general "disciplines" for interpreting the

concealment element. *Id.* at 1476. First, we construe the money laundering statute as a "concealment statute–not a spending statute." *Id.* We reject an interpretation of the money laundering statute "to broadly encompass all transactions, however ordinary on their face, which involve the proceeds of unlawful activity." *United States v. Sanders*, 928 F.2d 940, 946 (10th Cir. 1991); *see also United States v. Edgmon*, 952 F.2d 1206, 1210 (10th Cir. 1991) ("[M]erely spending the proceeds of illegal activities does not violate the money laundering statute."). The statute criminalizes only transactions "designed in whole or in part [] to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity." 18 U.S.C. § 1956(a)(1)(B)(i).

Thus, we concluded in *Sanders* that the statute "reach[es] commercial transactions intended (at least in part) to disguise the relationship of the item purchased with the person providing the proceeds and that the proceeds used to make the purchase were obtained from illegal activities." 928 F.2d at 946. Along with "those transactions designed to conceal the identity of the participants," "the statute is aimed broadly at transactions designed in whole or in part to conceal or disguise *in any manner* the nature, location, source, ownership, or control of the proceeds of unlawful activity." *United States v. Lovett*, 964 F.2d 1029, 1034 n.3 (10th Cir. 1992).

As a second "discipline," we require the government to present *substantial* evidence of concealment for a conviction. *Garcia-Emanuel*, 14 F.3d at 1476. "[A]ctions that are merely suspicious and do not provide substantial evidence of a design to conceal will not alone support a conviction." *Id.* at 1475.

With these concepts in mind, we now analyze the twenty-four counts of money laundering on which Mr. Shepard was convicted. These counts concern three primary types of transactions. First, counts 5-8, 14-19, and 25-30 involve deposits of illegal proceeds into a joint bank account for Country Club Kennels, on which both Mr. Shepard and Kim were signatories. Second, counts 10 and 11 involve deposits of illegal proceeds into an account for Mr. Shepard's daughter, Chastity Shepard. Third, counts 1, 2, 4, and 20-22 involve the cashing of checks made payable to Danny Blood and "Eloy Moreno."

### 1.    Deposits into Country Club Kennels

The government presented evidence at trial that Mr. Shepard and Kim commingled sixteen illegal deposits with legitimate receipts in their Country Club Kennels' joint business account. These check deposits were of three kinds: counts 4-8 were checks made payable to Danny Blood; counts 14-20 were checks made payable to Jeremy Wooldridge; and counts 25-30 were checks made payable to "Eloy Moreno." Aplt's Br. at 27-28. As noted, neither Mr. Blood nor Mr. Wooldridge worked for Mr. Shepard's kennel, and "Mr. Moreno" did not exist.

-10-

An IRS agent testified at trial that Mr. Shepard's sixteen deposits into the Country Club Kennels account totaled $84,340.26, and the agent's records concerning the kennel account were admitted into evidence. Rec. vol. III, doc. 111, at 588, 592.

This circuit has noted that depositing illegal proceeds into the bank account of a legitimate business may support the inference of an intent to conceal. *See Garcia-Emanuel*, 14 F.3d at 1476. Other circuits agree. For example, the Fifth Circuit concluded that "[e]vidence that the defendant commingled illegal proceeds with legitimate business funds is sufficient to support a conviction under § 1956." *United States v. Rodriguez*, 278 F.3d 486, 491 (5th Cir. 2002). Similarly, the Seventh Circuit has stated that commingling of funds "is itself suggestive of a design to hide the source of ill-gotten gains." *United States v. Jackson*, 935 F.2d 832, 840 (7th Cir. 1991); *see also United States v. Bowman*, 235 F.3d 1113, 1117 (8th Cir. 2000) ("Depositing unlawfully obtained money into a seemingly legitimate business account . . . and passing [the money] off as funds of a legitimate business is sufficient evidence to allow a reasonable jury to conclude that [the defendant] intended to conceal the stolen nature of the money and its true ownership.") (internal citations and quotation marks omitted). We agree with these decisions and conclude that commingling unlawful and legitimate deposits supports the inference of an intent to conceal or disguise the illegal proceeds.

At Mr. Shepard's trial, the IRS agent presented evidence tracing sixteen

illegal checks to deposits in the Country Club Kennels' joint business account. Rec. vol. III, doc. 111, at 592. These unlawfully obtained checks, made payable to Mr. Blood, Mr. Wooldridge, and "Mr. Moreno," were fraudulently endorsed prior to deposit in the kennel account. A jury could reasonably infer that these deposits were commingled with legitimate kennel profits to conceal the nature, source, or ownership of the illegal proceeds. Thus, we find sufficient evidence of concealment to support Mr. Shepard's convictions on the sixteen counts involving unlawful deposits into the Country Club Kennels account.

2.    Deposits into Mr. Shepard's daughter's account

Counts 10 and 11 involve Mr. Shepard's deposits of illegal proceeds into the account of his daughter, Chastity Shepard. At trial, the IRS agent testified that Mr. Shepard deposited two checks into his daughter's bank account. Rec. vol. III, doc. 111, at 593. The checks, made payable to Jeremy Wooldridge, bore an endorsement of Mr. Wooldridge and Mr. Shepard and totaled $1,147.45. *Id.*

"[U]sing third parties to conceal the real owner" supports the inference of an intent to disguise or conceal illegal funds. *Garcia-Emanuel*, 14 F.3d at 1476. Under 18 U.S.C. § 1956(a)(1)(B)(i), we may infer a design to conceal or disguise unlawful proceeds "when a defendant transfers those proceeds into the control of others with whom the defendant has a very close relationship." *Bowman*, 235 F.3d at 1116. Other circuits examining deposits of illegally obtained money into

a relative's account have found such deposits probative of an intent to conceal or disguise. The Eighth Circuit concluded that a defendant's deposit of criminally derived funds into his girlfriend's checking account, which she later used to buy personal items, "evinces the design to conceal." *Id.* The Fifth Circuit found sufficient evidence to satisfy the concealment element under § 1956 when a defendant's wife placed illegally obtained money in a safe deposit box under a relative's name. *United States v. Short*, 181 F.3d 620, 626 (5th Cir. 1999); *see also United States v. Stephenson*, 183 F.3d 110, 120 (2d Cir. 1999) (holding the concealment element satisfied when defendant's wife put illegal drug proceeds into a safe deposit box in her name).

This court has not specifically addressed the concealment element when a defendant deposits unlawfully obtained proceeds into a family member's account. However, in light of *Garcia-Emanuel*, other circuits' treatment of illegal deposits into a relative's account, and our standard of review of a jury verdict, we find sufficient evidence of concealment to support Mr. Shepard's conviction for counts 10 and 11. A rational jury could reasonably conclude that Mr. Shepard intended to conceal or disguise the unlawfully gained checks when he deposited them in his daughter's account.

3. Checks made payable and cashed by Danny Blood or "Eloy Moreno"

-13-

In the remaining six counts, checks made payable to falsified CWC employees were cashed. Counts 1, 2, and 4 involve checks made payable to Danny Blood, with an alleged endorsement by Danny Blood on the back. Checks involved with counts 20 and 22 were made payable to "Eloy Moreno," with the printed name "Eloy Urquidi" on the back of the checks. The check related to count 21 was also made payable to "Eloy Moreno." On the back, this check included the printed name of "Eloy Urquidi" and a second endorsement by Oscar Hernandez, the CWC's employee supervisor in Liberal. The IRS agent testified at trial that these six checks totaled $20,841. Rec. vol. III, doc. 111, at 589-90.

Government witnesses testified that Mr. Shepard prepared and caused others to prepare false documentation related to wages, per diem, and rental equipment. According to these witnesses, Mr. Shepard then sent these false documents to CWC to generate fraudulent wage, per diem, and rental equipment checks made payable to both real and falsified individuals. Rec. vol. I, doc. 109, at 154, 172-73; Rec. vol. II, doc. 110, at 306-10. Mr. Blood testified that he personally cashed for the Shepards only two rig rental checks made payable to him, but he "didn't get every one" and at some point the fraudulent rig rental checks were no longer delivered to him. Rec. vol. I, doc. 109, at 173-74. The IRS agent stated that Mr. Shepard and Kim deposited checks made payable to Mr. Blood. Rec. vol. III, doc. 111, at 555. In addition, Mr. Hernandez testified that

Mr. Shepard directed him to complete fraudulent employment application forms for "Eloy Moreno," who did not work at the Liberal site and may not have been a "real person." Rec. vol. II, doc. 110, at 306-10.

These checks made payable to Mr. Blood and Mr. Moreno yet cashed by Mr. Shepard evinced an intent to conceal or disguise the illegal funds. *See Garcia-Emanuel*, 14 F.3d at 1475-76. By falsifying documentation to CWC with individuals who never worked at the Liberal site, Mr. Shepard's transactions were structured "in a way to avoid attention," "us[ed] third parties to conceal the real owner," and involved "highly irregular features." *Id.* Thus, a reasonable jury could find Mr. Shepard guilty of counts 1, 2, 4, and 20-22.

## B. Conspiracy to commit money laundering

The jury found Mr. Shepard guilty of one count of conspiracy to commit money laundering under 18 U.S.C. § 1956(h). To convict Mr. Shepard, the government was required to prove (1) the existence of an agreement (2) to break the law, (3) an overt act (4) in furtherance of the conspiracy's object, and (5) that he willfully entered the conspiracy. 18 U.S.C. § 371; *United States v. Hanson*, 41 F.3d 580, 582 (10th Cir. 1994). "The agreement or confederation to commit a crime" is the essence of any conspiracy conviction. *Id.* at 582 (internal quotation marks omitted).

Mr. Shepard argues that we should find no conspiracy in the absence of a

design to conceal. However, as we have shown, the government clearly introduced sufficient evidence from which a reasonable jury could conclude that Mr. Shepard had the requisite intent to conceal illegal funds. Witnesses testified that Mr. Shepard falsified time sheets to generate false payroll and rig rental checks, received checks from CWC made payable to non-employees, caused others to cash the checks, and falsely endorsed and mailed checks for deposit into the accounts for Country Club Kennel and his daughter. Rec. vol. I, doc. 109, at 154, 171-73; Rec. vol. II, doc. 110, at 306-10; Rec. vol. III, doc. 111, at 703-12. The evidence is therefore sufficient to support Mr. Shepard's conviction for conspiracy to commit money laundering.

## C.    Transportation of stolen property

The jury also convicted Mr. Shepard of one count of transportation of stolen property under 18 U.S.C. § 2314. To convict Mr. Shepard of this offense, the government was required to prove that (1) he transported "goods, wares, merchandise, securities or money" in interstate or foreign commerce; (2) those goods have a value of "$5,000 or more;" and (3) he "[knew] the same to have been stolen, converted or taken by fraud." 18 U.S.C. § 2314; *Dowling v. United States*, 473 U.S. 207, 214 (1985).

Mr. Shepard argues that the government did not establish an underlying theft for most of the property, and that with regard to the remaining property, the

government did not show that its valuation exceeded $5,000. Aplt's Br. at 36. Mr. Shepard maintains that CWC's on-site representative, Mr. Hernandez, authorized most of the disputed property to be moved. Mr. Shepard acknowledges, however, that he may have "misused machinery to engage in building projects in Missouri" or misstated facts "related to who owned the property in question." *Id.* at 37.

At trial, two CWC truck drivers, Mr. Blood and Mr. Loya, testified that they hauled equipment on several occasions from the Liberal site to the Thayer, Missouri kennel that Mr. Shepard and Kim owned. Rec. vol. I, doc. 109, at 120-25, 176-79. Mr. Shepard and Kim asked Mr. Blood to haul equipment to Missouri "two or three times." *Id.* at 177-78. Mr. Shepard also provided directions to Mr. Loya after Mr. Hernandez instructed a Missouri delivery. *Id.* at 125. A KN Energy district foreman visited the Thayer site in June 1998. The foreman took photographs of the equipment at issue and prepared a list of items with an estimated value of $88,854. Rec. vol. II, doc. 110, at 430-34. Also, the CWC owner, Jose Cisneros, stated that he did not authorize Mr. Shepard or Kim to move any equipment from the Liberal site to Missouri. *Id.* at 406.

CWC truck drivers testified that Mr. Shepard instructed them to transport KN Energy property from Kansas to the Shepards' property in Missouri, and this property was cumulatively valued in excess of $5,000. Furthermore, the

government's evidence allowed a reasonable jury to conclude that Mr. Shepard knew the KN Energy property "to have been stolen, converted or taken by fraud." 18 U.S.C. § 2314. The evidence, viewed in the light most favorable to the government, is therefore sufficient to support conviction on one count of transportation of stolen property.

**D.     Wire fraud**

The jury found Mr. Shepard guilty of one count of wire fraud under 18 U.S.C. § 1343. That section provides, in part:

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned . . . .

To establish wire fraud under 18 U.S.C. § 1343, the government was required to prove (1) a scheme or artifice to defraud and (2) use of interstate wire communications to facilitate that scheme. *United States v. Bailey*, 327 F.3d 1131, 1140 (10th Cir. 2003). The government proves a scheme to defraud by showing "conduct intended or reasonably calculated to deceive persons of ordinary prudence or comprehension." *United States v. Janusz*, 135 F.3d 1319, 1323 (10th Cir. 1998) (internal quotation marks omitted).

Count 9 of the indictment alleged that Mr. Shepard and Kim:

-18-

[F]or the purpose of executing a scheme and artifice to defraud, and for obtaining money by means of false and fraudulent pretenses and representations, did knowingly and willfully transmit and cause to be transmitted in interstate commerce by means of wire communication certain writings, signs, signals and sounds which transmitted information concerning wages to be paid to Danny Blood by Cisneros Welding and Construction [CWC] in Odessa, Texas, for the purpose of obtaining money for the defendants, when the defendants knew they were not entitled to this money.

Rec. vol. I, doc. 30, at 5 (Superceding Indictment, filed Feb. 12, 2002). This count concerns information that Mr. Shepard and Kim wired to CWC to generate a check made payable to Mr. Blood.

In challenging the evidence supporting this conviction, Mr. Shepard argues that the rig rental checks under Mr. Blood's name were legitimate rental charges for equipment actually owned by Mr. Shepard. Aplt's Br. at 39. In addition, Mr. Shepard asserts that CWC's on-site representative, Mr. Hernandez, approved the billing method and knew that rig rental checks were being billed through Mr. Blood. *Id.*

We are not convinced by Mr. Shepard's assertions. The government presented evidence at trial that Mr. Shepard and his son Kim e-mailed or faxed time sheets from the Liberal site to Odessa, Texas, where CWC processed checks for wages, per diem, and rig rentals. Rec. vol. I, doc. 109, at 209. In Odessa, the CWC general manager downloaded payroll sheets from the Shepards each Monday morning and called Kim to verify delivery. Rec. vol. II, doc. 110, at 379-

-19-

Furthermore, Mr. Blood's own testimony confirmed that he was not a welder, did not have a welding rig on the Liberal site, and should not have received rig rental checks. Rec. vol. I, doc. 109, at 167-68, 172-73. We conclude that the government provided sufficient evidence that Mr. Shepard transmitted information about Mr. Blood's wages through interstate commerce to generate a fraudulent check.

## III. CONCLUSION

We therefore AFFIRM Mr. Shepard's convictions on all counts.