**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**May 26, 2009**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

    Plaintiff-Appellee,

v.

EUSEBIO AGUILERA-MEZA,

    Defendant-Appellant.

No. 08-4102

(D.C. No. 2:05-CR-00887-DAK)
(D. Utah)

**ORDER AND JUDGMENT**[*]

Before **BRISCOE, McKAY,** and **HARTZ**, Circuit Judges.

    A jury convicted Eusebio Aguilera-Meza on two counts of conspiring to commit money laundering, one count of conducting an unlicensed money transmitting business, two counts of failing to file a Currency Transaction Report, and one count of illegal reentry. The district court sentenced Aguilera-Meza to 276 months' imprisonment and 36 months' supervised release. Aguilera-Meza appeals his convictions and sentence. We have jurisdiction pursuant to 28 U.S.C.

---

[*] This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

§ 1291, and affirm.

I

With others, Aguilera-Meza operated Envios Aguilera, a business that conducted wire transfers of money between the United States and Mexico. At times, the business operated without the necessary licensing. Through this business, Aguilera-Meza transmitted from the United States to Mexico funds from illegal drug transactions.

Based on these actions, a grand jury indicted Aguilera-Meza and several co-defendants on eleven counts. Specifically, the grand jury charged that Aguilera-Meza: (1) conspired under 18 U.S.C. § 1956(h) to commit money laundering under 18 U.S.C. § 1956(a)(2)(A), (B) ("Count 1"); (2) operated an unlicensed money transmitting business under 18 U.S.C. § 1960 ("Count 3"); (3) conspired under 18 U.S.C. § 1956(h) to commit money laundering under 18 U.S.C. § 1956(a)(3)(B) ("Count 5"); (4) failed to file a required report on a currency transaction on August 3, 2005 under 31 U.S.C. § 5313 ("Count 6"); (5) failed to file a required report on a currency transaction on September 1, 2005 under 31 U.S.C. § 5313 ("Count 7"); and (6) reentered the United States after being removed in violation of 8 U.S.C. § 1326(a) ("Count 9").

Discovery on these charges was extensive, including several recorded conversations, transcripts, and business records. By September 20, 2006, when Aguilera-Meza's trial counsel was added for his defense, discovery filled boxes

2

and was available through a searchable computer database. Counsel began receiving and reviewing this discovery by November of 2006.

On November 13, 2006, Aguilera-Meza filed a motion to continue his trial, then set for February 5, 2007. The court granted this motion, continuing the trial to June 25, 2007. On April 26, 2007, Aguilera-Meza filed his second motion to continue trial based on the amount of discovery to review, noting "defense counsel has not had adequate time to review all discovery received . . . ." R. Vol. I, Doc. 265 at 1. The district court granted the second motion, continuing trial to November 27, 2007. On October 2, 2007, Aguilera-Meza filed his third motion to continue trial. After hearing arguments from counsel, the district court denied this motion and directed the parties to exchange exhibits by November 7, 2007. On November 15, 2007, Aguilera-Meza filed his fourth motion to continue trial, stating that "he and his counsel are not adequately prepared for trial in this matter, can not become adequately prepared for trial by the time of trial date, and that, if [Aguilera-Meza] is forced to go to trial at this time under these circumstances, he will be denied effective assistance of counsel." R. Vol. I, Doc. 312 at 1. Aguilera-Meza acknowledged receiving a list of "specific proposed exhibits . . . on November 12, 2007," and being informed of the identity of the confidential informant the week before. Id. at 2–3. After again hearing arguments from counsel, the district court denied the motion to continue trial. On November 21 and 27, 2007, Aguilera-Meza filed additional motions to continue

3

trial, citing concerns over the status of translations of recorded conversations and the difficulty for defense counsel to meet with Aguilera-Meza, who was in custody. The court denied these requests.

Aguilera-Meza also filed several pretrial discovery motions, including a request for a hearing under Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579 (1993), a request for disclosure of the identity of cooperating witnesses, and a motion in limine that also requested a hearing under United States v. James, 590 F.2d 575 (5th Cir. 1979). The district court denied the requests for the Daubert and James hearings. The government disclosed the identity of the confidential informant in early November 2007. On November 21, 2007, the prosecution filed its proposed witness list, which included the confidential informant.

The district court conducted Aguilera-Meza's trial from November 28, 2007 to December 7, 2007. The government presented testimony from fifteen witnesses during its case-in-chief. Among these witnesses, and relevant to the present appeal, were Roberto Cortez, Judy Romero, Leticia Valesquez, Michael Minichino, and Michael Hamideh. Jeff Fletcher, a Special Agent with the IRS, also testified and discussed an exhibit summarizing Aguilera-Meza's numerous transactions. All of these witnesses were listed on the government's witness list. Transcripts and translations of recorded conversations involving Aguilera-Meza were presented to the jury. Aguilera-Meza testified in his defense. The jury convicted Aguilera-Meza on all six counts. The district court sentenced Aguilera-

4

Meza to 276 months' imprisonment and 36 months' supervised release.

Aguilera-Meza now appeals, raising three primary arguments. First, Aguilera-Meza challenges the sufficiency of the evidence for his money laundering convictions. Second, Aguilera-Meza argues that his inability to properly cross-examine certain testimony violated his Sixth Amendment rights. Third, Aguilera-Meza argues that his sentence is disproportionate to the crimes for which he was convicted, violating his Eighth Amendment rights.

II

I.      The Money Laundering Conspiracy Convictions

On Count 1, the jury convicted Aguilera-Meza under 18 U.S.C. § 1956(h) of conspiring to commit money laundering under 18 U.S.C. § 1956(a)(2)(A), (B). On Count 5, the jury convicted Aguilera-Meza under 18 U.S.C. § 1956(h) of conspiring to commit money laundering under 18 U.S.C. § 1956(a)(3)(B). Aguilera-Meza argues that the government did not prove all of the elements necessary for a conviction under these statutes.

As a question of law, we review challenges to the sufficiency of the evidence de novo. United States v. Rahseparian, 231 F.3d 1257, 1261 (10th Cir. 2000) (applying this standard in the context of a money laundering conviction). In applying this standard, "we examine, in a light most favorable to the government, all of the evidence together with the reasonable inferences to be drawn therefrom and ask whether any rational juror could have found the essential

5

elements of the crime beyond a reasonable doubt." Id. (quotation omitted).

Section 1956(h) incorporates the other money laundering statutes, by providing: "Any person who conspires to commit any offense defined in this section . . . shall be subject to the same penalties as those prescribed for the offense the commission of which was the object of the conspiracy." 18 U.S.C. § 1956(h). To convict Aguilera-Meza under this statute, the government was required to prove: "(1) the existence of an agreement (2) to break the law, (3) an overt act (4) in furtherance of the conspiracy's object, and (5) that he willfully entered the conspiracy." United States v. Shepard, 396 F.3d 1116, 1123 (10th Cir. 1992). Here, the "law[s]" that the jury found that Aguilera-Meza agreed to "break" were 18 U.S.C. § 1956(a)(2)(A), (B) and § 1956(a)(3)(B).

Section 1956(a)(2) provides:

Whoever transports, transmits, or transfers, or attempts to transport, transmit, or transfer a monetary instrument or funds from a place in the United States to or through a place outside the United States or to a place in the United States from or through a place outside the United States—
(A) with the intent to promote the carrying on of specified unlawful activity; or
(B) knowing that the monetary instrument or funds involved in the transportation, transmission, or transfer represent the proceeds of some form of unlawful activity and knowing that such transportation, transmission, or transfer is designed in whole or in part—
(i) to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity; or
(ii) to avoid a transaction reporting requirement under State or Federal law, shall be sentenced to a fine of not more than $500,000 or twice the value of the monetary instrument or funds involved in

6

> the transportation, transmission, or transfer whichever is greater, or imprisonment for not more than twenty years, or both. For the purpose of the offense described in subparagraph (B), the defendant's knowledge may be established by proof that a law enforcement officer represented the matter specified in subparagraph (B) as true, and the defendant's subsequent statements or actions indicate that the defendant believed such representations to be true.

Id. § 1956(a)(2). Thus for Count 1, the government was required to prove that Aguilera-Meza agreed to (1) transfer or attempt to transfer funds (2) from the United States (3) to a place outside of the United States (4) "with the intent to promote the carrying on of specified unlawful activity"; or "knowing that the . . . funds involved in the . . . transfer represent the proceeds of some form of unlawful activity and knowing that such . . . transfer is designed in whole or in part to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity." Id.; Cuellar v. United States, 128 S. Ct. 1994, 2002 (2008).

In pertinent part, § 1956(a)(3) provides:

> Whoever, with the intent . . . (B) to conceal or disguise the nature, location, source, ownership, or control of property believed to be the proceeds of specified unlawful activity . . .
> conducts or attempts to conduct a financial transaction involving property represented to be the proceeds of specified unlawful activity, or property used to conduct or facilitate specified unlawful activity, shall be fined under this title or imprisoned for not more than 20 years, or both. For purposes of this paragraph and paragraph (2), the term "represented" means any representation made by a law enforcement officer or by another person at the direction of, or with the approval of, a Federal official authorized to investigate or prosecute violations of this section.

7

Id. § 1956(a)(3). Thus for Count 5, the government was required to prove that Aguilera-Meza entered into an agreement (1) with the intent to (2) "conceal or disguise the nature, location, source, ownership, or control of property" that (3) he believed to be the proceeds of specified unlawful activity (4) by conducting a financial transaction (5) involving property that was represented to be the proceeds of, or used to conduct, specified unlawful activity. Id.

First, Aguilera-Meza contends that the government failed to connect the money laundering in Count 1 with an underlying "specified unlawful activity." 18 U.S.C. § 1956(a)(2)(A), (B). Aguilera-Meza asserts, "no financial transaction was separate from and in addition to the underlying crime of unlicensed money transmitting affecting interstate and foreign commerce, in violation of 18 U.S.C. § 1960(2) also charged against [Aguilera-Meza]." Aplt. Br. at 22. We reject this argument.

The evidence at trial indicates that the specified unlawful activity necessary to support Aguilera-Meza's convictions for money laundering was drug trafficking. Aguilera-Meza's briefing repeatedly acknowledges this.[1] Aguilera-

---

[1] We note that in Aguilera-Meza's reply brief, he alters this argument, conceding that "[t]he trial court record is replete with inferences and innuendoes that some third parties were dealing in drugs, but [now arguing] there is no direct evidence of any particular drug transaction, the proceeds of which ended up in the hands of Aguilera-Meza, and which were then laundered." Aplt. Reply Br. at 16. To the extent this argument first appears in Aguilera-Meza's reply brief, we do not consider it. See United States v. Fields, 516 F.3d 923, 949 (10th Cir. 2008) (declining to address new arguments first raised in a reply brief). To the extent

(continued...)

8

Meza testified that he was not involved in drug trafficking, noting that he does not "even drink or smoke." R. Vol. 2, Dec. 6, 2007 at 62. Consequently, the underlying crime, drug trafficking, was separate from the crimes of unlicensed money transmitting affecting interstate or foreign commerce and money laundering. Aguilera-Meza's reference to a "merger problem" is without merit. Aplt. Br. at 24; see United States v. Kennedy, 64 F.3d 1465, 1477 (10th Cir. 1995) ("All that is required to violate [§] 1956 is a transaction meeting the statutory criteria that takes place after the underlying crime has been completed.").

Second, Aguilera-Meza contends that the funds he transferred to Mexico were not "proceeds" under the money laundering statute, citing United States v. Santos, 128 S. Ct. 2020 (2008). Aguilera-Meza argues that the funds he transferred were to buy additional drugs, and were therefore not profits. Aplt. Br. at 24, 28.

Even if we were to agree that Santos holds that under § 1956 "proceeds" should be defined by "profits" and not "receipts," this distinction is of no help to Aguilera-Meza. Santos, 128 S. Ct. at 2025. His argument is countered by an example the Supreme Court provides in Santos: "For example, someone accepting

[1](...continued)
this argument merits consideration, none of the identified elements of conspiracy to commit money laundering requires evidence of a specified instance of the unlawful activity. Instead, the elements require evidence that the funds were proceeds of unlawful activity.

9

receipts from what he knows to be a long-continuing drug-dealing operation can be found to know that they include some profits. And a jury could infer from a long-running launderer-criminal relationship that the launderer knew he was hiding the criminal's profits." Santos, 128 S. Ct. at 2029. The evidence presented in the present case established that Aguilera-Meza repeatedly accepted receipts from persons he knew were drug dealers, creating the inference that at least some of the funds included profits. Accordingly, the distinction between proceeds and receipts discussed in Santos does not support Aguilera-Meza's position.

Third, Aguilera-Meza argues that the evidence was insufficient to show an intent to conceal or disguise the nature, location, source, ownership, or control of the proceeds of specified unlawful activity.[2] In United States v. Shepard, we identified evidence potentially probative of an intent to conceal as including: "unusual secrecy surrounding the transaction; structuring the transaction to avoid attention; depositing illegal profits in the bank account of a legitimate business; highly irregular features of the transaction; using third parties to conceal the real

---

[2] Aguilera-Meza explicitly argues that "[t]he statute is clear that it requires proof that the purpose of the transportation or transfer was to cleanse illicit funds of their appearance of taint with criminality"; "creating the appearance of legitimate wealth is the criminal conduct targeted by the money laundering statute." Aplt. Br. at 25–26. This language does not appear in the statute. We do not find Aguilera-Meza's efforts to include this requirement into the statutorily-listed elements to be persuasive. Cuellar v. United States, 128 S. Ct. 1994, 2000–01 (2008) (similarly rejecting the inclusion of a "legitimate wealth" element).

10

owner; [and] a series of unusual financial moves cumulating in the transaction . . . ." 396 F.3d 1116, 1120 (10th Cir. 2005) (quotation omitted).

Aguilera-Meza concedes that "[t]he evidence before the lower court specifically indicates that [Aguilera-Meza] took money into his business, deposited the funds into his own account, then transferred money to other accounts, some of them fictitious, or caused money to go to Mexico by check cashing." Aplt. Br. at 30–31. This concession acknowledges that he deposited the funds in the bank account of a "legitimate" business, and used third parties to conceal the real owner. Moreover, the use of fictitious accounts indicates structuring the transaction to avoid attention, and is a highly irregular feature of the transaction. See Shepard, 396 F.3d at 1123 (noting that the use of fake names demonstrates an intent to conceal or disguise the illegal funds because it structures the transaction "in a way to avoid attention," "use[s] third parties to conceal the real owner," and "involve[s] highly irregular features").

II.     Sixth Amendment

Aguilera-Meza argues that the district court violated his right "to be confronted with the witnesses against him," U.S. Const. amend VI, by (1) allowing the testimony of last-minute witnesses; (2) allowing the testimony of a confidential informant whose identity was not given until the last minute; (3) allowing the admission of translated transcripts; (4) allowing portions of expert testimony; (5) admitting summary exhibits; and (6) allowing co-conspirator

11

statements. Each of these arguments stems in part from the district court's denial of Aguilera-Meza's requests for a continuance.

We review a denial of a request for a continuance for abuse of discretion. United States v. Flanders, 491 F.3d 1197, 1216 (10th Cir. 2007). A trial court "enjoys broad discretion on matters of continuances, even when the parties implicate Sixth Amendment issues." United States v. Mendoza-Salgado, 964 F.2d 993, 1016 (10th Cir. 1992). In exercising its broad discretion, we have identified several factors for the district court to consider: "[1] the diligence of the party requesting the continuance; [2] the likelihood the continuance, if granted, would accomplish the purpose underlying the party's expressed need for the continuance; [3] the inconvenience to the opposing party, its witnesses, and the court resulting from the continuance; [4] the need asserted for the continuance and the harm that appellant might suffer as a result of the district court's denial of the continuance." United States v. Rivera, 900 F.2d 1462, 1475 (10th Cir. 1990) (quotation omitted).

Here, the district court had granted several motions for continuance filed by Aguilera-Meza. By the time the case was finally tried, Aguilera-Meza's counsel had worked on the case for over one year and presumably understood the issues. At trial, the government called many witnesses, each of whom would have been inconvenienced had the court granted yet another continuance. While he identifies several areas where he considered his defense preparation to be

12

deficient, Aguilera-Meza has not made any specific allegation on appeal as to how he would have directly benefitted from a continuance. Even if the district court did not explicitly address these concerns in its denial, "it remained free to balance the numerous factors articulated here in rejecting [Aguilera-Meza's] motion [for a continuance]." Mendoza-Salgado, 964 F.3d at 1016. We conclude that the district court did not abuse its discretion in denying Aguilera-Meza's requests for a continuance.

A.    Last-Minute Witnesses

Aguilera-Meza asserts that "[t]he government only informed [him] of the testimony of Robert[o] Cortez, Judy Romero, and Leticia Valesquez mere days before the trial." Aplt. Br. at 32. Aguilera-Meza contends that this short notice prejudiced his defense by not providing sufficient preparation time.

We review the admission of testimony from last-minute witnesses for abuse of discretion. United States v. Nevels, 490 F.3d 800, 802–03 (10th Cir. 2007) (applying this standard for "unlisted government witnesses"). We review de novo, however, whether the admission of such evidence violates the Confrontation Clause of the Sixth Amendment. United States v. Townley, 472 F.3d 1267, 1271 (10th Cir. 2007).

We disagree with Aguilera-Meza's characterization of these witnesses as "last minute." The government listed these witnesses in its proposed witness list, which was filed one week before trial. R. Vol. I, Doc. 318 at 1–2. Moreover,

13

Aguilera-Meza does not identify how the timing of the government's disclosure of the identified witnesses violated any court order.

Even if we accept the assertion that the timing of the government's witness disclosure hindered the ability to confront the witnesses, we reject Aguilera-Meza's unsupported assertion that "[t]he trial court erred by denying [Aguilera-Meza] his right to confrontation." Aplt. Br. at 33. "The Supreme Court has established that no constitutional right to pretrial discovery of witnesses exists in non-capital cases." Nevels, 490 F.3d at 803 (citing Weatherford v. Bursey, 429 U.S. 545, 559 (1977)) (emphasis omitted). Additionally, there is not a statute or rule of procedure requiring pretrial disclosure of non-expert witnesses. Id.

This reasoning equally resolves Aguilera-Meza's unsupported assertion that "[t]he District Court erred in allowing the testimony of the confidential informant, whose identity was not given . . . until the last minute, despite his early demand to identify the informant." Aplt. Br. at 31. See United States v. Green, 178 F.3d 1099, 1108 (10th Cir. 1999) (rejecting the argument that "because [defendant] was unaware of the informant's identity until trial, his Sixth Amendment right to confront and cross-examine the key witness against him was never provided . . . ." (quotation omitted)).

B.    James Hearing

Aguilera-Meza states that he "timely demanded a [James] hearing . . . , [and that the district court's decision to] proceed without a [James] hearing

14

compromised [his] right to due process." Aplt. Br. at 34. We reject this argument for several reasons.

First, it does not appear that Aguilera-Meza "timely" requested a <u>James</u> hearing. Aguilera-Meza did not file a motion requesting a <u>James</u> hearing. Instead, Aguilera-Meza's reference to a <u>James</u> hearing appears in a paragraph of a motion in limine filed the day before the start of trial. R. Vol. I Doc. 332, at 3 ("For that purpose, the defendant would be entitled to a <u>James</u> hearing in advance of the proposed testimony."). Even if we were to construe Aguilera-Meza's reference to a <u>James</u> hearing as a request for a <u>James</u> hearing, this request was untimely.

Second, while we have reiterated "our strong preference" for <u>James</u> hearings when the prosecution relies on co-conspirator statements, a <u>James</u> hearing is not required. <u>United States v. Gonzalez-Montoya</u> 161 F.3d 643, 648–49 (10th Cir. 1998). In the alternative to holding a <u>James</u> hearing, a district court may properly admit a co-conspirator statement "by provisionally admitting the statement with the caveat that the party offering it must prove the existence of the predicate conspiracy through trial testimony or other evidence." <u>Id.</u> at 649 (internal quotations and alterations omitted); <u>Townley</u>, 472 F.3d at 1273 (identifying both alternatives). The trial court retains some discretion in choosing between these alternatives. <u>United States v. Urena</u>, 27 F.3d 1487, 1491 (10th Cir. 1994).

15

Aguilera-Meza does not contend that the district court erred in its provisional admission of the co-conspirator testimony.[3]  Further, Aguilera-Meza does not specifically identify to which co-conspirator statements he objects, offering only the conclusory statement, "[t]he testimony of both Hamideh and Minichino are replete with discussions of conversations between themselves and [Aguilera-Meza's] wife, Veronica Moran, her father, her cousin, or [Aguilera-Meza's] brothers[; s]uch statements should have been found to be hearsay, not specifically in furtherance of a money laundering conspiracy . . . ."  Aplt. Br. at 34.  Based on our prior analysis concluding there was sufficient evidence to support Aguilera-Meza's money laundering convictions, we conclude that the district court's decision to not conduct a James hearing did not prejudice Aguilera-Meza.

Aguilera-Meza also argues that the admission of the co-conspirator statements violated his Sixth Amendment right to confrontation under Crawford v. Washington, 541 U.S. 36 (2004).  We explicitly rejected similar arguments in Townley.  472 F.3d at 1273 ("We find no merit to Appellant's unfounded and unsupported contention that Crawford's instruction on testimonial hearsay somehow eviscerated Federal Rule of Evidence 801(d)(2)(E), especially since Rule 801(d)(2)(E) treats declarations by coconspirators not as an exception to the

---

[3]  In his reply brief, Aguilera-Meza asserts, without support or citation, that "the Government . . . was permitted wholesale to inquire of multiple witnesses about bad conduct, not eventually tied to [Aguilera-Meza]."  Aplt. Reply Br. at 6.

hearsay rules, but as nonhearsay.").

C.    Expert Testimony

Aguilera-Meza raises several objections related to the district court's admission of expert testimony. Aguilera-Meza, without support, first asserts that the trial court violated his Sixth Amendment right to confrontation by not conducting a Daubert hearing. While a district court must "make some kind of reliability determination" before admitting expert testimony, the district court retains "great latitude in determining how to make Daubert reliability findings." United States v. Velarde, 214 F.3d 1204, 1209 (10th Cir. 2000) (emphasis omitted). Accordingly, "Daubert does not mandate an evidentiary hearing." United States v. Nichols, 169 F.3d 1255, 1262 (10th Cir. 1999) ("[W]e simply require a sufficiently developed record in order to allow a determination of whether the district court properly applied the relevant law." (quotation omitted)).

Second, Aguilera-Meza argues that the district court improperly admitted expert testimony by law enforcement officers regarding foreign language translations. We address these arguments related to these witnesses individually.

Aguilera-Meza challenges the testimony of Michael Minichino, a criminal investigator with the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF"), for his qualifications as a Spanish translator. Minichino testified, however, that he had two years of formal Spanish education at the University of Utah and has used Spanish in his capacity as a federal law enforcement officer.

17

R. Vol. 2, Nov. 29, 2007, at 87. Based on this testimony, "[t]he trial court clearly could have found [Minichino's] qualifications sufficient to satisfy the liberal standard under Fed. R. Evid. 702 regarding expert qualifications." See United States v. Gomez, 67 F.3d 1515, 1526 (10th Cir. 1995) (applying this conclusion to an individual with a minor in Spanish who also had spoken Spanish on a 23-month religious mission in South America).

Similarly, Aguilera-Meza challenges the testimony of Michael Hamideh, a Salt Lake City Police Officer, regarding his expertise in Spanish drug slang. Aguilera-Meza objects to Hamideh's commenting upon the definition of "debtos" and "mercandia." Spanish, however, was Hamideh's first language; his mother was Peruvian. R. Vol. 2, Nov. 30, 2007, at 37. Hamideh worked "approximately 50 or more times" in an undercover capacity speaking in Spanish drug slang. Id. ("[T]he primary type of undercover work that I've done has been in Spanish. And so all my experience has been with Spanish terminology."). These qualifications establish Hamideh's ability to testify regarding Spanish drug slang. United States v. Verdin-Garcia, 516 F.3d 884, 893 (10th Cir. 2008) ("Once foundation is laid that a translator has that savvy, her translation of drug slang is no more a matter of opinion than her translation of any other slang or idiomatic usage. Differences of opinion on the proper meaning or translation of a slang term are to be resolved . . . through cross-examination or by the presentation of another qualified

18

translator with a contrary view.").[4]

Aguilera-Meza also challenges these witnesses' qualifications as experts in voice recognition. Both witnesses, however, had previously conversed with Aguilera-Meza. Because they heard Aguilera-Meza's voice in person, they could identify his voice under Federal Rule of Evidence 901(b)(5).[5] United States v. Hardwell, 80 F.3d 1471, 1494 (10th Cir. 1996) ("Expert testimony is not required for identification of a voice.").

Third, Aguilera-Meza challenges the testimony of Jeff Fletcher, a Special Agent with the IRS, for his testimony "concerning the money transfers" and his references to "summary exhibits." Aplt. Br. at 40–41. The basis of Aguilera-Meza's challenge to this testimony appears to be the district court's denial of a Daubert hearing and Aguilera-Meza's inability to refute the summary exhibit due to short notice.

---

[4] Even if we found that Hamideh was insufficiently qualified to comment on Spanish drug slang, Aguilera-Meza did not suffer any prejudice from this testimony. Aguilera-Meza does not cite where in the trial transcript the slang terms, "debtos" and "mercandia," are mentioned in the trial transcript. Instead, it appears that Aguilera-Meza challenges, in part, testimony on the word "drogas." Aguilera-Meza, at repeated prompting by defense counsel, testified that "drogas" is Spanish for "debts." E.g., R. Vol. 2, Dec. 6, 2007 at 1128, 1176, 1182 ("D-R-O-G-A-S, D-R-O-G-A-S, that's the word that you're talking about; correct? . . . In this context, you understand the word 'drogas, drogas' to be debts, debts?").

[5] Rule 901(b)(5) provides an example for identification conforming with the rules of Evidence: "Identification of a voice, whether heard firsthand or through mechanical or electronic transmission or recording, by opinion based upon hearing the voice at any time under circumstances connecting it with the alleged speaker." Fed. R. Evid. 901(b)(5).

19

To the extent these unsupported and conclusory arguments merit consideration, we reject them.  As stated, a <u>Daubert</u> hearing is not mandatory. <u>Nichols</u>, 169 F.3d at 1262.  Further, Aguilera-Meza has not identified any prejudice resulting from the denial of the <u>Daubert</u> hearing and the admission of Fletcher's testimony.[6]  Unquestionably, Fletcher's background of twelve years as a special agent with "I.R.S. Criminal Investigations," an international finance degree, and extensive training into money laundering investigations, qualified him as an expert on "money transfers."  R. Vol. 2, Dec. 4, 2007, at 830–31.

Regarding the summary exhibits, "[t]he admission of summaries . . . is within the sound discretion of the trial court."  <u>United States v. Thompson</u>, 518 F.3d 832, 858 (10th Cir. 2008) (quotation omitted).  Aguilera-Meza has not indicated how the district court abused its discretion or how he was prejudiced by the short notice.  Although he states that "he saw the summary just immediately before trial," Aguilera-Meza provides no citation, support, or argument to indicate why this summary exhibit required additional time given his months of access to the unabridged evidence.

---

[6] In his reply brief, Aguilera-Meza "asserts that virtually the entirety of the testimony (the money tracing, and then testimony as to the ultimate issue), violated the purview of the jury, when he testified that the purpose of the money moving activities he had tracked in the exhibits would be to conceal the source of the money . . .  Only Agent Fletcher . . . testified that this evidence constituted the crime of money laundering.  This likely would have had a significant impact in the jury's mind, and would not constitute 'harmless error.'" Aplt. Reply Br. at 13–14.  These arguments do not clarify how a <u>Daubert</u> hearing would have impacted the admission of this testimony.

20

We conclude the district court did not err in the admission of testimony or summary exhibits.

III.    The Eighth Amendment

Lastly, Aguilera-Meza "asserts that this sentence [of 276 months' imprisonment and 36 months' supervised release] is unduly harsh given the . . . the underlying crimes . . . ." Aplt. Br. at 42. Aguilera-Meza contends the sentences for the charges, except Count 9, merge. Additionally, Aguilera-Meza argues that his sentence violates the Cruel and Unusual Punishments Clause in the Eighth Amendment based on his comparison of his sentence with the sentences of his co-defendants.

We review de novo whether a sentence violates the Eighth Amendment. United States v. Gillespie, 452 F.3d 1183, 1190 (10th Cir. 2006). First, Aguilera-Meza's money laundering convictions, which were based on the underlying criminal activity of drug trafficking, do not merge with the other financial transaction convictions. Second, Aguilera-Meza has not identified any co-defendant that is similarly situated; he makes no comparison to the present convictions or criminal histories between himself and any co-defendant. United States v. Rojas, 531 F.3d 1203, 1209–10 (10th Cir. 2008) ("[Defendant] cannot show he is similarly situated to his co-defendants. His criminal history is more extensive than [theirs]."). Finally, we note, "the Constitution does not require the crime and the sentence to be strictly proportional. Instead, it forbids only

21

extreme sentences that are grossly disproportionate to the crime. Generally, a sentence within the limits imposed by statute is neither excessive nor cruel and unusual under the Eighth Amendment." Gillespie, 452 F.3d at 1190 (internal citation and quotation omitted). Aguilera-Meza does not argue that his sentence violates any statute or the Sentencing Guidelines. To the contrary, Aguilera-Meza's sentence appears to be below the applicable Sentencing Guidelines range. Cf. Rojas, 531 F.3d at 1209 ("A sentence which falls within a properly calculated Guideline range is entitled to a rebuttable presumption of reasonableness." (quotation omitted)). We conclude that the district court did not err in sentencing Aguilera-Meza.

III

We affirm.

Entered for the Court


Mary Beck Briscoe
Circuit Judge