**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**April 11, 2018**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

MICHAEL SHANDELON BROWN, a/k/a
Kaos, a/k/a Ozz,

    Defendant - Appellant.

No. 16-6210
(D.C. No. 5:15-CR-00093-M-10)
(W.D. Okla.)

_____

**ORDER AND JUDGMENT**[*]
_____

Before **HARTZ**, **PHILLIPS**, and **MORITZ**, Circuit Judges.
_____

This appeal stems from Michael Shandelon Brown's drug-conspiracy

conviction under 21 U.S.C. §§ 846, 841(a)(1), (b)(1)(A), and his money-laundering-

conspiracy conviction under 18 U.S.C. § 1956(a)(1)(B)(i), (h). A multi-agency

investigation implicated Brown in a cocaine base (crack cocaine) trafficking

conspiracy in Oklahoma City, Oklahoma. The government first charged Brown and

his co-conspirator, Daryl Lee Ingram, with possession with intent to distribute crack

cocaine in an earlier case. The jury convicted Ingram but acquitted Brown. After the

acquittal, the government charged Brown, Ingram, and their associates Anthony

_____

[*] This order and judgment is not binding precedent, except under the doctrines
of law of the case, res judicata, and collateral estoppel. It may be cited, however, for
its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

Anderson, Michael Banks, and Xavier Guerrero with drug conspiracy. The government also charged Brown, Ingram, Banks, and Guerrero with money-laundering conspiracy. A jury found Brown guilty on both counts.

Brown now challenges his drug-conspiracy and money-laundering conspiracy convictions on several bases. Exercising jurisdiction under 28 U.S.C. § 1291, we affirm.

## BACKGROUND

### I. Operation Rollin' Rock

In fall 2014, the FBI, the Oklahoma City Police Department, the IRS, and the United States Postal Inspection Service participated in a months-long investigation (called Operation Rollin' Rock) into the Oklahoma City chapter of the Los Angeles-based Rollin' 90's gang and its associated drug-trafficking activities. The Rollin' 90's Oklahoma City chapter had structured its gang "not unlike the military," with a tiered hierarchy including a leader, trusted lieutenants, and foot soldiers. R. vol. 3 at 102:15–18. Daryl Lee Ingram led the gang and the drug conspiracy; as a result, he was Operation Rollin' Rock's primary target. Anderson and Banks, meanwhile, acted as Ingram's "trusted lieutenants or captains." *Id.* at 108:7–9.

Investigators learned that members of the Oklahoma City chapter of the Rollin' 60's gang, another Los Angeles-based gang, also participated in the drug conspiracy. Both Brown and Guerrero belonged to the Rollin' 60's and participated in the conspiracy, but only Brown lived in Oklahoma City—Guerrero lived in Los Angeles. Investigators weren't surprised that the Rollin' 90's and the Rollin' 60's

worked together; they're allied gangs that "work[] together to fight back against other gangs or to make money." *Id.* at 109:24–25.

On November 7, 2014, officers executed seven search warrants, known as a "take-down," at residences associated with the Rollin' 90's in Oklahoma City. *Id.* at 124:17. Though some of the searches bore fruit, others didn't. Believing search warrants to be imminent, Ingram had the houses cleared out. The day before the take-down, Ingram and Brown paid cash to fly to California. Ingram fled to avoid police.

When Brown and Ingram arrived in California, Shavon Howell, Guerrero's daughter's mother, rented Ingram a hotel room at the Hyatt House. Howell agreed to rent Ingram the room on her credit card. Howell made four payments totaling more than $4,000 for Ingram's hotel stay from November 9 to November 29 at the Hyatt House. Ingram paid Howell back in cash. Howell knew that a second person had stayed with Ingram, but didn't describe that person further. On December 9, 2014, Brown flew back to Oklahoma City from Los Angeles.

*II. The Money-Order Scheme*

With Ingram safely in California, Banks began orchestrating a money-order scheme to launder drug profits in Oklahoma City and send them to Los Angeles to fund Ingram's extended stay. Soon after the two men's arrival in California, police learned "that there was a large amount of cash being converted to money orders" in Oklahoma City by Rollin' 90's associates. *Id.* at 1142:15–18. And once the associates had converted the cash into money orders, they mailed the money orders "to Los Angeles where they were subsequently cashed." *Id.* at 1142:17–18.

3

Directing the money-order scheme, Banks had his mother, Linda Banks, and his children's mothers, Gabrielle Stevenson and Satin Watley, purchase and mail blank money orders to specified addresses in Los Angeles. Linda Banks and Watley mailed the money orders under Linda Banks's name and address. Stevenson mailed the money orders she purchased under the name and address of a "Finesse Johnson," her alias. She later testified that she believed that the money for the money orders had come from illegal activity. At Banks's direction, the women mailed the money orders they purchased to a "Deshean Jennings" or a "Markese Jackson," at 5025 Crenshaw Boulevard, Los Angeles, California. Agents later learned that Guerrero used "Deshean Jennings" as an alias and that he lived at 5025 Crenshaw Boulevard with his aunt.

All told, associates in the money-laundering scheme sent $41,000 in money orders from Oklahoma to California to benefit Ingram. Of that, Brown cashed eight $1,000 money orders that had been purchased and mailed by people associated with Banks. Howell testified that, when the money orders arrived in Los Angeles, Ingram would have her cash them. She said that Ingram gave her the money orders in increments of five, typically at a value of $1,000 per money order. After she cashed the money orders, she handed the money over to Ingram. Even though Brown received all eight money orders in two mailings, he cashed two per day, spread out over several days.

On November 29, 2014, police officers arrested Banks at his friend's home in Oklahoma City. During a protective sweep of the home, police found 496.4 grams of

4

crack cocaine, a digital scale, two guns, a black Oster hand-mixer bag, and $17,440 in cash. The officers also found a photograph on Banks's kitchen table that showed Banks, Ingram, and Brown together.

From Banks's arrest forward, the money-order scheme changed. Linda Banks, Stevenson, and Watley no longer purchased and mailed the money orders. Instead, different names were used to ship the money orders, for instance, the names Robert Jackson, Michelle Willis, and Cynthia Anderson. Robert Jackson is Brown's uncle, Michelle Willis is Sheba Michelle Willis, Brown's friend, and Cynthia Anderson is Sheba Willis's neighbor. At trial, Jackson testified that he had never mailed any money orders to Los Angeles; that he didn't know the receiver listed on the package, Markese Jackson; that he didn't know anyone who lived at the address the money orders were mailed to, 5025 Crenshaw Boulevard in Los Angeles; and that the handwriting on the packages with his name and address wasn't his. He also testified that he uses the name Robert Brister when he writes, so he wouldn't have listed himself as "Robert Jackson." He further testified that he had never met Howell, who frequently cashed the money orders mailed under Jackson's name and address. Finally, he testified that Brown had asked him for his address a "couple of times," saying "that he want[ed] it for a job." R. vol. 3 at 1290:14–18.

Meanwhile, Howell continued to cash the money orders, as did others. For instance, on February 2 and 3, 2015, a woman named Summer Savage cashed two of the money orders in Dallas, Texas.

5

IRS Agent Robert Summers studied the above-described money-order transactions and identified two specific patterns. First, he noted that the associates involved here had never cashed more than $3,000 worth of money orders at a time. This enabled them to avoid United States Postal Service Form 8105-A's reporting requirements, which (1) would have permitted law enforcement to search for the money orders by name and (2) would have required both the payor and payee to show identification. Agent Summers described "structuring" as the practice of breaking down large transactions into smaller ones to avoid filing requirements. Based on his training and experience, Agent Summers testified that structuring is a hallmark of money laundering and that structuring enabled Brown, Guerrero, and other associates to avoid the Form 8105-A reporting requirements. *Id.* at 1774:14–16. Second, Agent Summers noted that the associates had mailed the money orders blank, meaning they wrote no names on the money order's payee space. Agent Summers testified that this practice also indicates money laundering—it provides anonymity because no information other than the money order's serial number is generated. Because of the risk, people don't usually send money orders without named payees; doing so is equivalent to sending cash through the mail.

Agent Summers also investigated whether Ingram, Banks, or Brown had any legitimate sources of income to fund the money orders. Neither Ingram nor Banks did. Except for two checks from a horse-auction company to Brown, one for $374 and the other for $500, Agent Summers found no other possible legitimate sources of income for him.

6

*III. The Traffic Stop*

On February 17, 2015, a confidential informant told Oklahoma City police that Anderson was selling crack cocaine from a white Honda Civic. Detective Jeff Reed ran the Civic's license-plate number, which the informant had provided. Detective Reed knew that Anderson was a Rollin' 90's gang member, and after running the plate, he learned that the Civic was registered to a Laneisha Blackshire, shown as residing at 3344 Southwest 24th Street. As Detective Reed drove by that address, he passed a grey Kia traveling in the opposite direction. He suspected that the driver was Tyree Cade, who he knew had an active arrest warrant. He thought that the Kia's driver had "similar features" to Cade including the same "race, sex, build, [and] hair length."[1] *Id.* at 757:1–2. While Detective Reed was watching the Kia, the driver parked in front of 3344 Southwest 24th Street, which officers later learned was Anderson's house.

Detective Reed continued down the road and parked his car. Using binoculars, he watched the two men get out of the car and walk through the front yard and into the house. He called Lieutenant Robert Coniglione, the Gang Enforcement Unit supervisor, and asked for assistance in stopping the Kia should its occupants return to the car and drive away. Lieutenant Coniglione replied that "they would be en route immediately." *Id.* at 735:15.

---

[1] Later, Detective Reed identified Brown as the driver and Ingram as the passenger.

7

While Detective Reed waited for Lieutenant Coniglione to arrive, he continued surveilling the house. He saw Anderson come outside, lean into the white Honda Civic parked in the driveway, and then go back into the house. A few minutes later, Detective Reed saw the two men who had arrived in the Kia leave the house and get back into their car. He estimated that the two men were in Anderson's house for "[j]ust a couple of minutes." *Id.* at 738:8. The man who sat in the Kia's passenger seat carried a black bag. Detective Reed didn't remember whether the man had carried anything into Anderson's house. The Kia drove away.

Lieutenant Coniglione and his riding partner, Sergeant Andy Ritchie, drove their patrol car toward Anderson's house to set up a "loose perimeter." *Id.* at 770:25–771:5. But just as they arrived in the area, the Kia left Anderson's house. Detective Reed provided Lieutenant Coniglione and Sergeant Ritchie the Kia's travel direction, and they soon found and began following it. Once the officers saw the driver "fail[] to keep right of center," they activated the patrol car's emergency lights to pull over the Kia. R. vol. 3 at 802:16. The Kia continued at a normal speed for another block before turning a corner and stopping. After parking behind the Kia, Sergeant Ritchie and Lieutenant Coniglione got out and began walking to the Kia. As soon as the officers reached the Kia's bumper, the car sped away.

Sergeant Ritchie and Lieutenant Coniglione quickly returned to the patrol car and pursued the Kia at speeds up to 60 miles per hour in a 25-mile-per-hour zone. Eventually, Brown took a turn too quickly, veered off the road, and got the Kia stuck. Brown and Ingram then fled on foot. Lieutenant Coniglione started to run after

8

Brown and Ingram but yielded to other responding officers. The newly arrived officers captured and arrested Brown and Ingram.

Lieutenant Coniglione returned to the Kia. Looking inside it, he noticed a zipped, black Oster bag on the front, passenger-side floorboard. Inside the bag, he found $4,980 in cash and 26 baggies of crack cocaine, which together weighed 650.7 grams.

Police seized and impounded the Kia, and Detective Scott Smith obtained a search warrant for it. Inside, he found several cell phones. Brown had used one of these phones, as shown by a "selfie" Brown had taken with the phone. *Id.* at 1156:9. That phone also contained a photo of Guerrero, Ingram, and Cade in front of Howell's home in Los Angeles, as well as a photo of Brown, Guerrero, and Ingram in Howell's driveway. On the Kia's passenger-side floorboard, Detective Smith found a parking pass for apartment 419 at the Moda Apartments in Dallas, Texas. And in the center cup holder, he found a key ring with a metal tag that read, "ZRS Managements," and a circular key fob marked "419." *Id.* at 874:2–874:8. Detective Smith next searched the Kia's trunk, where he found men's clothing and a package of rubber bands. In addition, he found two receipts, one memorializing a December 14, 2014 purchase from a Macy's store in Culver City, California, and the other memorializing a February 10, 2015 purchase from a Target in Dallas, Texas of two TVs and several cell phones.

Sonya Brown, Brown's cousin, testified that she had rented the car "[t]o get back and forth to work" and that she had used the car for about a week before the

9

traffic stop. *Id.* at 1273:9. She said that on February 17, 2015, even though she had to work that day, she let Brown "use [the Kia] to go and put in a job application." *Id.* at 1273:13–14. Addressing the evidence Detective Smith had found in the car, Brown's cousin said she'd never been to Culver City, had never seen the Macy's receipt, and had no idea how it got in the car. She also said she'd never been to the Target on the second receipt, that she didn't put the second receipt in the car, and hadn't seen it before.

Following up on the evidence about apartment 419, Oklahoma City police called Detective Oscar Carrasco with the Dallas Police Department, and asked him to verify that an apartment 419 was located at 1855 Payne Street in Dallas, Texas, and to learn whether Summer Savage (the woman who cashed two money orders in Dallas, Texas just days before Brown and Ingram were arrested in Oklahoma City) lived there. Detective Carrasco advised that the address was correct, and that Savage had rented apartment 419.

Dallas police then obtained and executed a search warrant at apartment 419. Inside, Dallas police found three new TVs, $3,000 bundled with rubber bands in a night stand, three cellphones in the master-bedroom dresser, a napkin with phone numbers written on it, and a ledger reflecting $110,000 in outstanding drug debts. Police recognized Brown's phone number on the napkin. Additionally, police connected Brown to the Dallas apartment by a photograph recovered from his cell phone during the traffic stop. The photo showed Ingram in apartment 419, with several cell phones laid out on the kitchen's countertops.

10

On the same day as the traffic stop, police obtained a search warrant for Anderson's home. During the search, police found a wet Pyrex dish, a box of baking soda, and a plate coated with white residue in a microwave oven.[2]

*IV. The Court Proceedings*

Relying on the cocaine located in the Kia, the government charged Brown and Ingram with possession of cocaine base with intent to distribute it, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(A). Brown moved to suppress the evidence found in the Kia, alleging the traffic stop wasn't justified at its inception. The district court denied Brown's motion because the officers had seen Brown commit a traffic violation, namely, drifting across the center of the road. The jury convicted Ingram but acquitted Brown.

About three weeks after the jury's verdict, a grand jury sitting in the Western District of Oklahoma indicted Brown, Ingram, Anderson, Banks, and Guerrero for conspiring to "possess with intent to distribute and to distribute more than 280 grams of a mixture or substance containing" crack cocaine, in violation of 21 U.S.C. §§ 846, 841(a)(1), (b)(1)(A).  R. vol. 1 at 32–33, 175–176. The grand jury also indicted Brown, Ingram, Banks, and Guerrero with conspiring to launder money by "conduct[ing] financial transactions . . . , which . . . involved the proceeds of . . . the felonious buying, selling, and dealing in cocaine base, . . . knowing that the

---

[2] Johndra Osbourne testified at trial that to make crack cocaine, a person mixes powder cocaine with baking soda and water in a Pyrex dish, and then cooks the mixture in a microwave oven.

11

transactions were designed in whole or in part to conceal and disguise the nature, location, source, ownership and control of the proceeds," in violation of 18 U.S.C. § 1956(a)(1)(B)(i), (h). *Id.* at 47–48, 186–87. Before trial, Brown moved to sever his trial from that of his co-defendants'. He also filed a motion to dismiss his drug-conspiracy charge, and to prevent the government from introducing evidence about his gang affiliation. The court denied all three motions.

Brown also sought, once again, to suppress the evidence from the traffic stop, asking the court to reconsider its order denying his suppression motion in the earlier case. The court denied this motion, too. For its part, the government filed a motion to preclude evidence of Brown's acquittal from the first case, which the court granted.

The jury found Brown guilty of the drug-conspiracy and money-laundering-conspiracy charges. The district court sentenced him to 120 months of imprisonment for each count of conviction, to be served concurrently. Brown now appeals his convictions. Exercising jurisdiction under 28 U.S.C. § 1291, we affirm.

## ANALYSIS

On appeal, Brown argues that the district court erred in seven ways: (1) by concluding that sufficient evidence supported his convictions; (2) by concluding that collateral estoppel didn't bar his prosecution for the drug conspiracy; (3) by disallowing him from informing the jury of his earlier acquittal; (4) by admitting evidence seized after the traffic stop; (5) by admitting evidence of his gang affiliation; (6) by denying a mistrial; and (7) by not severing his trial from that of his co-defendants'. We will address each issue in turn.

12

*I. Sufficiency of the Evidence*

Brown contends that the government introduced insufficient evidence to prove beyond a reasonable doubt that he was guilty of either drug conspiracy or money-laundering conspiracy. "We review the sufficiency of the evidence to support a jury verdict de novo and examine only whether taking the evidence, both direct and circumstantial, 'in the light most favorable to the government, a reasonable jury could find the defendant guilty beyond a reasonable doubt.'" *United States v. Phillips*, 583 F.3d 1261, 1264 (10th Cir. 2009) (quoting *United States v. Hanzlicek*, 187 F.3d 1228, 1239 (10th Cir. 1999)). The evidence "must be substantial, but it need not conclusively exclude every other reasonable hypothesis and it need not negate all possibilities except guilt." *United States v. Kitchell*, 653 F.3d 1206, 1228 (10th Cir. 2011) (quoting *Phillips*, 583 F.3d at 1264). We will reverse a conviction "only if no reasonable jury could have reached the challenged verdict." *Id.* (quoting *United States v. Hooks*, 551 F.3d 1205, 1212 (10th Cir. 2009)). "While undoubtedly deferential, this review has some bite: if the evidence does no 'more than raise a mere suspicion of guilt' or requires 'piling inference upon inference' to conclude the defendant is guilty, we will reverse the conviction." *United States v. Mullins*, 613 F.3d 1273, 1280 (10th Cir. 2010) (quoting *United States v. Rakes*, 510 F.3d 1280, 1284 (10th Cir. 2007)).

We first address whether the government presented sufficient evidence to support Brown's drug-conspiracy conviction, and then we turn to whether the

government presented sufficient evidence to support his money-laundering-conspiracy conviction.

*(a)    Drug Conspiracy*

A jury found Brown guilty of the charged drug-trafficking conspiracy under 21 U.S.C. §§ 846, 841(a)(1), (b)(1)(A). To do so, it had to find the following elements beyond a reasonable doubt:

> First: Two or more persons agreed to violate the federal drug laws;
> Second: The defendant knew the essential objective of the conspiracy;
> Third: The defendant knowingly and voluntarily involved himself in the conspiracy;
> Fourth: There was interdependence among the members of the conspiracy; [and]
> Fifth: The overall scope of the conspiracy involved at least two hundred eighty (280) grams of a mixture or substance containing cocaine base.

R. vol. 1 at 572; *see* 21 U.S.C. §§ 846, 841(a)(1), (b)(1)(A)(iii). On appeal, Brown challenges the sufficiency of the evidence supporting the second and third elements.

The second element and the third element's knowing participation sub-part overlap, so the government can satisfy both by showing "that the defendant shared a common purpose or design with his alleged coconspirators." *United States v. Pickel*, 863 F.3d 1240, 1252 (10th Cir. 2017) (quoting *United States v. Hamilton*, 587 F.3d 1199, 1206 (10th Cir. 2009)). To meet the third element's voluntary participation requirement, the government must prove that the defendant played at least "a minor role in the conspiracy." *Id.* at 1252. The jury doesn't need to find the defendant necessary to the conspiracy; it needs to find only that the defendant was "an operational link within it." *United States v. Cornelius*, 696 F.3d 1307, 1318 (10th Cir.

14

2012). And it need not find that a defendant participated in "drug collection, handling, or sales," to sustain a drug-conspiracy conviction. *United States v. Garcia-Torres*, 280 F.3d 1, 4 (1st Cir. 2002). Even ancillary functions, such as accounting, strong-arm enforcement, and communicating on behalf of drug dealers may sustain a drug-conspiracy conviction. *Id.* Still, performing a peripheral service, without the "aim to forward or assist the conspiracy," isn't enough to prove that a defendant knew a drug conspiracy's objective and voluntarily participated in it. *Id.*

Here, the evidence more than sufficed. First, Brown's affiliation with an allied gang and his close connection to Ingram permitted the jury to infer Brown's knowledge of the conspiracy's objective and his knowing participation in it. Brown's Rollin' 60's affiliation and the two gangs' practice of working together to make money could have led the jury to infer that Ingram's drug-trafficking conspiracy was one such joint venture, and therefore that Brown shared the conspiracy's common purpose or design. Plus, when Ingram found out that several Rollin' 90's-affiliated houses were going to be searched, he fled to California and took Brown with him. The jury could have reasonably inferred (1) that Ingram wouldn't bring an uninvolved party with him to California while attempting to flee from the police, and (2) that by accompanying Ingram to California, Brown, too, had fled from the police. From this latter inference, the jury could have concluded that Brown shared a common purpose or design with the conspiracy.

Second, Brown's attempts to flee law enforcement during the February 17, 2015 traffic stop also reasonably supported an inference that Brown shared a

15

common design or purpose with other conspirators. When law enforcement attempted to pull him over, Brown didn't comply—he sped off, led police on a high-speed chase, and then when the Kia became stuck, he fled on foot. A jury could have reasonably inferred that Brown knew full well about the 650.7 grams of crack cocaine discovered in the Kia. And the jury could also have inferred that Brown sped away from the traffic stop and led police on a high-speed chase to prevent Ingram's arrest, which would have furthered the drug conspiracy by protecting its leader. The traffic-stop evidence reasonably suggested that Brown was involved in the conspiracy, and in his attempt to avoid police, knowingly participated in it.

Turning to the third element's voluntary participation sub-part, we see several ways the jury could have concluded that Brown performed ancillary functions that facilitated the conspiracy's objective. For instance, the jury could have concluded that Brown asked his cousin, Sonya Brown, to rent the Kia under her name, and that in doing so, he had aimed to avoid putting either his or Ingram's name on a rental agreement.

Further, Brown's December 9, 2014 flight back to Oklahoma City and the evidence Detective Smith recovered from the Kia established a timeline that rationally supported Brown's voluntary participation in the drug conspiracy. That flight, the receipts found in the trunk of the Kia, and the keys and parking pass found in the car's cabin, allowed the jury to infer that Brown (1) flew back to Oklahoma City and rented the Kia, (2) drove the Kia from Oklahoma City back to Los Angeles to pick up Ingram, (3) drove Ingram from Los Angeles to Dallas to rent apartment

16

419, and (4) drove Ingram from Dallas back to Oklahoma City. The December 14, 2015 Culver City, California Macy's receipt, and the February 10, 2015 Dallas-area Target receipt, plus Savage's cashing of two money orders in Dallas only twelve days before police arrested Brown and Ingram, belied Brown's cousin's story about having rented the Kia for herself for only a week. The jury could have reasonably believed that Brown voluntarily participated in the conspiracy by driving Ingram on drug business.

Also, the jury could reasonably have found that Brown acted as an ancillary facilitator of the drug conspiracy after he and Ingram returned to Oklahoma City. Once they arrived, Brown drove Ingram to see Anderson, a suspected crack-cocaine dealer and known Rollin' 90's gang member. Brown went inside Anderson's house with Ingram, and Ingram came back out carrying a black Oster bag. Immediately after leaving Anderson's house, the traffic stop ensued, and police arrested Brown and Ingram and recovered 650.7 grams of crack cocaine from the Kia. A search of Anderson's house on the day of Ingram's and Brown's arrest produced a wet Pyrex dish, a hand-mixer, and crack cocaine residue on a microwave plate inside a closed microwave. Johndra Osbourne, a Rollin' 90's gang member who Ingram gave crack cocaine to sell, testified that these items are used to manufacture crack cocaine. These facts permitted the jury to infer that Ingram had manufactured crack cocaine at Anderson's house on February 17, 2015, just before the traffic stop, and that Brown had assisted Ingram with this task by driving Ingram to and from Anderson's house.

17

Additionally, the evidence that Brown participated in the money-order scheme also supported an inference of Brown's role as an ancillary facilitator of the drug conspiracy, and thus satisfied the voluntary participation sub-part of the third element. *United States v. Burgos*, 94 F.3d 849, 859 (4th Cir. 1996) ("In addition to selling narcotics, that [drug-conspiracy] participation may assume a myriad of other forms, such as . . . purchasing money orders for coconspirators."). Based on Howell's testimony that Ingram gave her the money orders, and that she cashed them and then gave him back the money, the jury could have inferred that when Brown cashed the money orders he also did so at Ingram's request and for Ingram's benefit. The government presented evidence that Brown had cashed eight $1,000 money orders in a manner consistent with structuring to avoid filing and reporting requirements. The jury could have reasonably inferred that Brown had structured the cashing of his money orders to purposefully conceal the drug conspiracy's profits. In turn, the jury could have concluded that in purposefully concealing the conspiracy's profits, Brown performed an ancillary function for the conspiracy that demonstrated Brown's voluntary participation.

Despite all of the above evidence supporting elements two and three of Brown's drug-conspiracy conviction, Brown counters that the evidence was nevertheless insufficient because no direct evidence established that he knew Ingram had crack cocaine in the black Oster bag found in the Kia, and because the government didn't admit evidence showing that he personally participated in drug deals or manufactured crack cocaine. But the government didn't need to prove Brown

18

knew that the black bag had crack cocaine in it—it needed to prove his knowledge of the conspiracy's objective. Likewise, because the government presented sufficient evidence that Brown performed several ancillary functions facilitating the conspiracy's purpose, the government didn't need to further prove that Brown made or sold drugs to prove his voluntary participation in the conspiracy.

From all of the above evidence and its corresponding inferences, a rational jury could have determined that Brown knew the objective of Ingram's drug-trafficking organization and that he knowingly and voluntarily participated in it. The evidence therefore sufficed to support Brown's drug-conspiracy conviction.

*(b)    Money-laundering Conspiracy*

The jury also found Brown guilty of conspiring to launder money, in violation of 18 U.S.C. § 1956(a)(1)(B)(i), (h). To do so, it had to find the following elements beyond a reasonable doubt:

1. First, the defendant agreed with at least one other person to violate federal money laundering laws as described in Count 14— here, the federal law prohibiting financial transactions knowing that the property involved represented the proceeds of some unlawful activity with the intention to disguise the nature, location, source, ownership, or control of the property;
2. Second, the defendant knew the objective of the conspiracy;
3. Third, the defendant voluntarily and knowingly involved himself in the conspiracy; and
4. Fourth, there was interdependence among the members of the conspiracy.

R. vol. 1 at 587; *see* 18 U.S.C. § 1956(a)(1)(B)(i), (h). Brown argues that the government presented insufficient evidence to prove the first three elements.

19

As to the first element, § 1956 is "a concealment statute—not a spending statute." *United States v. Garcia-Emanuel*, 14 F.3d 1469, 1476 (10th Cir. 1994). It reaches transactions designed to conceal the participants' identities, as well as "transactions designed in whole or in part to conceal or disguise *in any manner* the nature, location, source, ownership, or control of the proceeds of unlawful activity." *United States v. Lovett*, 964 F.2d 1029, 1034 n.3 (10th Cir. 1992). To carry its burden, the government must "present *substantial* evidence of concealment for a conviction." *United States v. Shepard*, 396 F.3d 1116, 1121 (10th Cir. 2005). Evidence sufficient to prove intent to conceal within the context of money-laundering includes the following:

> unusual secrecy surrounding the transaction; structuring the transaction in a way to avoid attention; . . . highly irregular features of the transaction; using third parties to conceal the real owner; a series of unusual financial moves cumulating in the transaction; or expert testimony on practices of criminals.

*Id.* at 1120 (quoting *Garcia-Emanuel*, 14 F.3d at 1475–76).

Here, the government presented sufficient evidence of Brown's intent to conceal by showing that Brown had cashed eight $1,000 money orders and structured those transactions in concert with his and Ingram's conspiracy associates. From this evidence, a rational jury could have inferred that Brown structured the transactions (1) to avoid reporting requirements, (2) to conceal Ingram's control of the money, and (3) to conceal that the money orders derived from drug profits. This evidence and its permissible inferences sufficiently prove Brown's intent to conceal the nature,

20

source, ownership or control of the cash obtained via the money orders, thus satisfying the first element.

As to the second and third elements, the evidence described above, plus the shift in the money-order scheme's pattern, permitted the jury to infer Brown's awareness of the scheme's purpose and his voluntary participation in it. After Banks's arrest, the names of people associated with Brown were used to mail the money orders. For instance, the names of Brown's uncle, Robert Jackson, his friend Sheba Michelle Willis, and Willis's neighbor were used to ship money orders to Los Angeles. Jackson's name and address were used to ship ten money orders to a "Markese Jackson" at Howell's home address. At trial, Robert Jackson testified that he didn't know a "Markese Jackson" and that he didn't recognize the address printed on the shipping label bearing his name. And even more suspicious, Brown called Jackson more than once to ask him for his address. The jury could have reasonably concluded that Brown had called his uncle and asked for his address so that he could, like Banks before him, direct people to purchase and mail blank money orders from Oklahoma City to Los Angeles, this time under Jackson's name. Also, in light of Banks's recent arrest, Brown's increased responsibility in the money-order scheme implied that he was familiar with the scheme's purpose. Accordingly, the changes in the scheme's pattern allowed the jury to infer Brown's awareness of, and participation in, the money-laundering conspiracy.

Despite the above evidence, Brown argues that his involvement in the money-order scheme can be innocently explained, and that the scheme's changed pattern

21

fails to show his "agreement, knowledge, and voluntary" participation in the money-laundering conspiracy. Appellant's Opening Br. at 21. Specifically, he contends that he grew up with many of his alleged co-conspirators, so "anyone could have written Jackson's information on the shipment labels." *Id.* at 24. And Brown argues that when he asked his uncle for his uncle's address, he could have been filling out employment applications, not recording an address for an associate to use to ship the money orders. But both of these counterarguments are unavailing.

It "defies belief that a reasonable juror" could see Brown's involvement in the money-order scheme, namely, structuring the cashing of eight $1,000 money orders and his relationship to the names of the money-order shippers once police arrested Banks, and conclude he was "somehow unaware of the true nature of the program." *See United States v. Fishman*, 645 F.3d 1175, 1188 (10th Cir. 2011). And even if Brown's explanations were plausible, the jury could have reasonably disbelieved them. Taking the evidence in the light most favorable to the government, we conclude the government's evidence sufficiently supported Brown's money-laundering-conspiracy conviction.

*II. Collateral Estoppel*

Brown argues that his acquittal on the original possession-with-intent-to-distribute charge collaterally estopped his prosecution on the drug-conspiracy charge in his second trial. We review collateral estoppel claims de novo. *United States v. Rogers*, 960 F.2d 1501, 1507 (10th Cir. 1992).

22

The Fifth Amendment's Double Jeopardy Clause incorporates the doctrine of collateral estoppel as a constitutional requirement in criminal cases. *Ashe v. Swenson*, 397 U.S. 436, 445–46 (1970). Collateral estoppel "means simply that when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit." *Id.* at 443.

Contrary to Brown's contention, his earlier acquittal doesn't collaterally estop the government from prosecuting him on the conspiracy charge. *See United States v. Rodgers*, 18 F.3d 1425, 1429 (8th Cir. 1994) ("But contrary to Michael and Alfred's contention, the collateral estoppel effect of their acquittal on the prior possession with intent charges does not bar prosecution of the conspiracy charge. The collateral estoppel effect only prevented the government from relitigating the fact of possession on the dates alleged in the original indictment."). Rather, his earlier acquittal precluded the government in his drug-conspiracy and money-laundering-conspiracy trial from submitting to the jury that he actually or constructively possessed the crack cocaine recovered from the Kia during the February 17, 2015 traffic stop. *See id.* At his second trial, the government never argued that Brown possessed the crack cocaine seized from the Kia after the traffic stop. Moreover, possession isn't an element of drug conspiracy, so the government could prove Brown guilty of the drug conspiracy without proving that he possessed any drugs, let alone the crack cocaine seized from the Kia. *See* R. vol. 1 at 572 and *supra* section *A.(1)*. So, collateral estoppel doesn't bar the government from prosecuting Brown for drug conspiracy.

23

*III. Brown's Acquittal*

Brown argues that the district court abused its discretion by not admitting evidence of his acquittal. We review the district court's evidentiary decisions for abuse of discretion. *United States v. Tome*, 61 F.3d 1446, 1449 (10th Cir. 1995). We consider the entire evidentiary record and will be "especially deferential when the challenged ruling concerns the admissibility of evidence that is allegedly hearsay." *Id.*

A judgment of acquittal is hearsay and doesn't meet one of the hearsay exceptions. *United States v. Sutton*, 732 F.2d 1483, 1493 (10th Cir. 1984). Acquittals are therefore generally inadmissible. *See id.* But Brown argues that his acquittal was nevertheless admissible under Rule 807, the residual exception. Under this exception, "a hearsay statement is not excluded by the rule against hearsay even if the statement is not specifically covered by a hearsay exception in Rule 803 or 804 [if]:

(1) the statement has equivalent circumstantial guarantees of trustworthiness;
(2) it is offered as evidence of a material fact;
(3) it is more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts; and
(4) admitting it will best serve the purposes of these rules and the interests of justice.

Fed. R. Evid. 807(a). Our court has observed that "an expansive interpretation of the residual exception would threaten to swallow the entirety of the hearsay rule," and should be used only "in extraordinary circumstances." *United States v. Lawrence*, 405 F.3d 888, 902 (10th Cir. 2005) (quoting *Tome*, 61 F.3d at 1452).

24

But because Brown's acquittal doesn't demonstrate actual innocence, and only proves that a jury found reasonable doubt as to the conduct charged, his acquittal fails the third prong of Rule 807(a). *United States v. One Assortment of 89 Firearms*, 465 U.S. 354, 361 (1984) ("[A]n acquittal on criminal charges does not prove that the defendant is innocent; it merely proves the existence of a reasonable doubt as to his guilt."). Brown's acquittal at most establishes that his first jury had a reasonable doubt whether he had possessed the crack cocaine found in the Kia; it doesn't significantly bear on whether he participated in the drug conspiracy. And since Brown's argument would justify admitting all acquittals, adopting his position would allow Rule 807's residual exception to swallow the general rule that judgments of acquittal are inadmissible hearsay. *See Lawrence*, 405 F.3d at 902. So, the district court didn't abuse its discretion in declining to invoke Rule 807 to admit Brown's acquittal.[3]

### IV. The Traffic Stop Evidence

Brown argues that the trial court erred by admitting evidence seized during the traffic stop because the stop wasn't justified at its inception. "We review de novo the 'ultimate determination of Fourth Amendment reasonableness.'" *United States v. Little*, 18 F.3d 1499, 1503 (10th Cir. 1994) (en banc) (quoting *United States v. Allen*,

---

[3] Brown also argues that the doctrine of curative admissibility permits him to introduce evidence of his acquittal. Curative admissibility applies only when other evidence has been improperly admitted. And Brown has not demonstrated that the court improperly admitted any of the government's evidence. More importantly, no facts suggest that the district court abused its discretion in declining to invoke curative admissibility to admit Brown's acquittal.

25

986 F.2d 1354, 1356 (10th Cir. 1993)). "[W]e accept the factual findings of the district court" and its credibility determinations "unless they are clearly erroneous." *United States v. Gregory*, 79 F.3d 973, 977 (10th Cir. 1996).

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. A traffic stop is reasonable under the Fourth Amendment if (1) it was justified at its inception and (2) the resulting detention was reasonably related in scope to the circumstances that justified the stop in the first place. *United States v. Salzano*, 158 F.3d 1107, 1111 (10th Cir. 1998). A traffic stop is justified at its inception "if the police officer has reasonable articulable suspicion that a traffic or equipment violation has occurred or is occurring." *United States v. Eckhart*, 569 F.3d 1263, 1271 (10th Cir. 2009) (quoting *United States v. Botero-Ospina*, 71 F.3d 783, 787 (10th Cir. 1995) (en banc)).

The district court determined that Lieutenant Coniglione and Sergeant Ritchie saw Brown violate § 32-192(a) of the Oklahoma City Municipal Code by crossing the center of the road. As such, the district court concluded that they had reasonable suspicion to stop the car. Section 32-192(a) of the Oklahoma City Municipal Code requires that cars be driven "right of the center of the roadway." [4] Okla. City Mun. Code ch. 32, art. V § 32-192(a) (2010). But Brown contends that the officers

---

[4] Section 32-192(a) states, "Upon all roadways of sufficient width a vehicle shall be driven to the right of the center of the roadway." Okla. City Mun. Code ch. 32, art. V § 32-192(a) (2010).

fabricated the traffic violation as a pretext to pull over the Kia. So, Brown argues, the stop wasn't justified at its inception, making it unreasonable under the Fourth Amendment.

First, Brown argues that Lieutenant Coniglione inconsistently described how much of the Kia crossed the center of the road. In Brown's first trial, Lieutenant Coniglione testified that Brown drifted left of center by "probably a quarter of the width of his car." Suppl. R. vol. 1 (*Brown I* Trial Transcript) at 94:9–11. But at the second trial, Lieutenant Coniglione testified that the car drifted over the center by a "[c]ar length maybe, it wasn't long." R. vol. 3 at 802:17–20. But Brown's argument isn't persuasive. No matter how far over the center of the road Brown drifted, that action violated § 32-192(a), which requires drivers to remain right of the center of the road.

Second, Brown argues that Sergeant Ritchie testified inconsistently about whether the road had a painted center line. Brown claims that Sergeant Ritchie's first report about the traffic stop stated that the Kia had crossed a center line but that, at Brown's second trial for drug conspiracy and money-laundering conspiracy, he testified "that Brown's vehicle didn't cross a marked center line in the road."[5] Appellant's Opening Br. at 43. This argument is inconsequential. Section 32-192(a) says vehicles "shall be driven to the right of the center of the roadway." Okla. City

_____

[5] Sergeant Ritchie's report isn't in the record, so we can't compare the two allegedly inconsistent statements. We do know that in the second trial, Sergeant Ritchie testified that "the vehicle went left of center" but didn't mention a center line. R. vol. 3 at 814:10–11.

Mun. Code ch. 32, art. V § 32-192(a) (2010). The ordinance contains no requirement that a marked line be crossed. *See id.* Whether Brown crossed a marked or an unmarked center line, he committed a traffic violation that justified the stop.

The officers justifiably stopped the car after witnessing a traffic violation. Thus, Lieutenant Coniglione and Sergeant Ritchie acted reasonably under the Fourth Amendment.

*V. Brown's Gang Affiliation*

Brown argues that the district court should have excluded evidence of his gang affiliation under Federal Rule of Evidence 404(b). "We review the district court's evidentiary ruling for an abuse of discretion." *United States v. Brown*, 200 F.3d 700, 708 (10th Cir. 1999).

Under Rule 404(b)(1), "[e]vidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Fed. R. Evid. 404(b)(1). Despite 404(b)'s general prohibition, such "evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b)(2). We apply a four-part test to determine whether Rule 404(b) evidence was properly admitted:

> (1) the evidence must be offered for a proper purpose; (2) the evidence must be relevant; (3) the trial court must make a Rule 403 determination of whether the probative value of the similar acts is substantially outweighed by its potential for unfair prejudice; and (4) pursuant to Fed. R. Evid. 105, the trial court shall, upon request, instruct the jury that evidence of similar acts is to be considered only for the proper purpose for which it was admitted.

28

*United States v. Roberts*, 185 F.3d 1125, 1141 (10th Cir. 1999) (quoting *United States v. Jefferson*, 925 F.2d 1242, 1258 (10th Cir. 1991)). Brown contests only the third prong—that the probative value of his gang affiliation was substantially outweighed by its prejudicial impact. Specifically, he contends that "[t]he very nature of gang affiliation evidence naturally distracts juries from the evidence and causes juries to focus on the defendant's character and criminal disposition." Appellant's Opening Br. at 54.

Brown's Rollin' 60's affiliation was highly probative because conspiracy charges often rely on circumstantial evidence. *United States v. Robinson*, 978 F.2d 1554, 1562–63 (10th Cir. 1992) (concluding that circumstantial evidence, like gang membership, is often the strongest evidence of conspiracy). And "associational or affiliation type evidence is often deemed probative of something other than either character evidence or evidence of other crimes, wrongs, or acts, subject to Rule 404." *Id.* at 1562. Here, Brown's gang affiliation helped explain his relationship to Ingram and the Rollin' 90's—that the two gangs had a past practice of working together to make money.

And the district court mitigated any prejudice with a limiting instruction, telling the jury that it could consider Brown's gang affiliation "for the limited purposes of establishing guilty knowledge, intent, plan, motive, and lack of mistake or accident, if any, and evaluating the credibility of witnesses." R. vol. 1 at 570; *see, e.g., United States v. Allen*, 610 F. App'x 773, 781 (10th Cir. 2015) (explaining that a limiting instruction concerning the appropriate use of gang-membership evidence

was one reason why such evidence's probative value wasn't substantially outweighed by the risk of unfair prejudice). The court also told the jury that "[m]embership or affiliation in a gang is not a crime." R. vol. 1 at 570.

So, because evidence of Brown's gang affiliation was highly probative on his participation in the conspiracy, and because the court's limiting instruction mitigated any prejudice he may have suffered from the introduction of that evidence, the court didn't abuse its discretion in admitting the evidence.

*VI. Mistrial Motion*

Brown argues that the district court erred when it denied his motion for a mistrial. He contends that the district court should have granted him a mistrial for wrongly allowing the evidence about the February 17, 2015 traffic stop and about his Rollin' 60's gang affiliation, and also for wrongly not allowing evidence of his acquittal. We review a district court's denial of a mistrial motion for an abuse of discretion. *See United States v. Morgan*, 748 F.3d 1024, 1039 (10th Cir. 2014).

Courts may grant mistrials when a defendant's right to a fair and impartial trial has been impaired. *United States v. Meridyth*, 364 F.3d 1181, 1183 (10th Cir. 2004). Mistrial motions "call for an examination of the prejudicial impact of an error or errors when viewed in the context of an entire case." *United States v. Gabaldon*, 91 F.3d 91, 94 (10th Cir. 1996). The erroneous admission of evidence may be so grave as to warrant a mistrial. *Morgan*, 748 F.3d at 1039–40.

But as seen above, we have concluded that the district court properly admitted evidence from the February 17, 2015 traffic stop and of Brown's gang affiliation, and

30

that it properly excluded evidence of Brown's earlier acquittal. And so, Brown's right to a fair and impartial trial wasn't impaired and the district court didn't abuse its discretion by denying his mistrial motion.

*VII. Severance Motion*

Brown argues that the district court erred by denying his severance motion because he and Ingram relied on mutually antagonistic defenses and had different degrees of culpability. We review a district court's denial of a severance motion for an abuse of discretion. *Id.* at 1043.

Federal Rule of Criminal Procedure 8(b) permits the government to charge two or more defendants in the same indictment "if they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses." In the federal system, we prefer to try defendants indicted as co-conspirators jointly, to serve judicial economy and to minimize the risk of inconsistent verdicts. *Zafiro v. United States*, 506 U.S. 534, 537 (1993).

And yet, even when joinder is proper under Rule 8(b), Rule 14(a) permits severance if a joint trial would prejudice either party. Fed. R. Crim. P. 14(a). Prejudice exists if the joint trial will compromise a specific trial right of one of the defendants, "or prevent the jury from making a reliable judgment" as to the guilt of the various defendants. *United States v. Edwards*, 69 F.3d 419, 434 (10th Cir. 1995) (quoting *United States v. Williams*, 45 F.3d 1481, 1484 (10th Cir. 1995)). A jury may be incapable of making a reliable judgment about guilt when marked differences in

31

culpability exist among defendants, or when the defendants rely on mutually antagonistic defenses. *Zafiro*, 506 U.S. at 538–39.

As an initial matter, because Rule 14 "leaves the tailoring of the relief to be granted, if any, to the district court's sound discretion," it doesn't *require* severance. *Id.* at 539. Here, the district court warned the jury, "You must separately consider the evidence against each defendant on each count and return a separate verdict for each defendant. Your verdict as to any one defendant or count, whether it is guilty or not guilty, should not influence your verdict as to any other defendants or counts." R. vol. 1 at 571. So even if Brown and Ingram presented mutually antagonistic defenses, and even if Brown was less culpable than his co-defendants, the court cured that prejudice by issuing a limiting instruction, a "less drastic measure[]" than severance. *Zafiro*, 506 U.S. at 539.

Turning to Brown's specific contentions, he argues that he and Ingram had antagonistic defenses because he didn't know Ingram had crack cocaine in the black bag on February 17, 2015. Also, he argues that because Ingram didn't take the blame for the contents of the bag, he and Ingram "were placed in the precarious position of 'pointing the finger' at each other in an attempt to shift the focus or blame." Appellant's Opening Br. at 50. But "[m]utually antagonistic defenses are not prejudicial *per se*," *Zafiro*, 506 U.S. at 538, and finger-pointing "defenses simply are not so contradictory that the jury must have necessarily disbelieved one to believe another." *United States v. Linn*, 31 F.3d 987, 992 (10th Cir. 1994). The jury could have believed Brown didn't know that the black bag from the traffic stop contained

crack cocaine, and still could have found him guilty on each of his charges. Brown fails to demonstrate why the mutual antagonism between Ingram and him uniquely required the district court to intervene, so we won't reverse the district court on this ground.

Brown's next argument, that he and Ingram had different degrees of culpability, doesn't warrant him a severed trial, either. "The mere fact that one co-defendant is less culpable than the remaining co-defendants is not alone sufficient grounds to establish a trial court abused its discretion in denying a severance." *United States v. Youngpeter*, 986 F.2d 349, 353 (10th Cir. 1993). Brown argues that unlike Ingram, he wasn't the drug-trafficking ringleader, and that unlike Banks, he didn't orchestrate the money-order scheme. That's true, but the government presented evidence that individually implicated Brown—for instance, his structured cashing of eight $1,000 money orders in Los Angeles and the high-speed chase during the February 17, 2015 traffic stop. His co-conspirators may have been more culpable, but that alone isn't a reason for us to conclude the district court erred by denying Brown's severance motion.

For all of these reasons, the district court didn't abuse its discretion in denying Brown's severance motion.

**CONCLUSION**

For the above reasons, we AFFIRM the district court.

Entered for the Court


Gregory A. Phillips
Circuit Judge